IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

DARRYL DANIELS,

    Petitioner,

v.

GREG LEWIS,

    Respondent.

No. C 10-04032 JSW

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

    Now before the Court is the petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 filed by California state prisoner, Darryl Daniels ("Petitioner"). The Petition is now ripe for consideration on the merits and for the reasons set forth below, the Petition is DENIED.

## BACKGROUND

    In October 2005, a Contra Costa jury convicted Petitioner Darryl Daniels, along with his co-defendant Charles Gordon, of two counts of attempted murder, one count of shooting from a motor vehicle, one count of shooting at an occupied motor vehicle, one count of carjacking, and one count of second degree robbery. (Amended Petition for Writ of Habeas Corpus ("Petition") at 1.) For all but the carjacking and robbery counts, the jury found an enhancement for use of a firearm in commission of each crime. (*Id.*) The trial court sentenced Petitioner to 56 years and 8 months to life in prison. (*Id.*)

    Daniels pursued a timely direct appeal of his conviction and on March 6, 2009, the California Court of Appeal affirmed Petitioner's conviction in an unpublished opinion. (*See id.* and Respondent's Memorandum of Points and Authorities in Support of Answer ("Memo") at

1.) On June 10, 2009, the California Supreme Court denied his petition for review. (Petition at 1.) On September 8, 2010, Petitioner timely filed the instant habeas petition in this Court. (Memo at 1.) Daniels remains in the custody of respondent Greg Lewis, the warden of Pelican Bay State Prison, in Crescent City, California. (Petition at 2.)

**STATEMENT OF FACTS**

The facts underlying the charged offenses as found by the Court of Appeal of the State of California, Fourth Appellate District, are set forth as follows:

>   Audie Williams testified that on September 22, 2004, he was talking to a woman on a street in Pittsburg when "I felt a gun stuck up in my back." A man demanded "everything I had," whereupon Williams surrendered $270 and a cell phone. Williams initially identified the robber to police as defendant Gordon, although at trial he testified that it was not Gordon. Pittsburg Police Officer Togonon and Detective Deplitch testified that Williams immediately, repeatedly, and emphatically identified Gordon as the man who robbed him.
>
>   Hilario Martinez testified that his personal property and his automobile were taken from him on December 1, 2004. Martinez testified that he was walking towards his Buick LeSabre when two men approached. One of the two men was Daniels, whom Martinez recognized. Either Daniels or the other man – Martinez did not remember which – showed a gun. One of the two – again Martinez did not remember which one – demanded that Martinez hand over his cell phone and the keys to his car. Martinez did so. Daniels was observed driving Martinez's car ten days later.
>
>   Daniels and Gordon were convicted of the attempted murder of Sean McClelland. McClelland did not testify because he died before the trial. Pittsburg Police Officer Erik Severe testified that on the evening of December 17, 2004, he went to a hospital and spoke with McClelland, who had been shot eight times outside the Woods Manor apartment complex. McClelland refused to identify who had shot him. Officer Severe testified that after he left McClelland he went to the apartment complex, where he observed a number of .40 and 9 mm. shell casings. The casings, which were clustered together by caliber, were collected as evidence. No witness to the shooting was found.
>
>   Rhonda Hardy testified that in December 2004 she lived at Woods Manor. She was friendly with Daniels and Gordon; her brother Steve was also a friend of Gordon's. Hardy also knew Sean McClelland, who was dating Gordon's sister, and who was often seen with Gordon.
>
>   Hardy testified that one evening in mid-December, Daniels and Gordon were at her apartment and she heard Daniels talking on the telephone to McClelland, telling him to come to one of the Woods Manor apartments "to come pick up the gun." Gordon left, then called the apartment and spoke to Daniels. Gordon returned, picked up Daniels – who put on "one of those pull-over hats" – and the two then left. Hardy testified that she saw Daniels and Gordon wait for McClelland. Each had a gun. When McClelland appeared, "they just started shooting." After McClelland staggered away, Daniels and Gordon stopped firing, and they ran from the scene.

2

That night, and again the next day, Gordon menacingly asked Hardy "what happened" and "what [did] I see." Hardy replied "nothing" because she was scared. "He asked me did I see who it was, and I just told him no." Gordon told Hardy "[D]on't talk to the police. [¶] ... [¶] They say they was killing everybody who was talking. Babies, mommas, kids, everything." The day after the shooting Daniels dropped by Hardy's apartment and threatened that "they would kill me, my mama, and my son" if she talked to police. In fact, "both of them," that is, Daniels and Gordon, threatened to kill her if she spoke with police. Moreover, both Daniels and Gordon in essence moved into Hardy's apartment and stayed for months, to ensure that she did not inform authorities of what she had seen.

Hardy testified about one occasion when one of the investigating officers came to her apartment while Gordon was there. Gordon would not allow Hardy to answer the knocking at the front door, and the officer left, after which Gordon remarked that "he could have shot him right then and there." Hardy called the telephone number on the card left by the officer. She told him about the McClelland shooting because "they [Daniels and Gordon] was threatening me, and I got tired of it." Daniels and Gordon not only threatened Hardy, they also threatened her teenage son, whom she told to stop visiting at her apartment.

After Hardy told the police, and suspecting that she had, Gordon threatened her that "if we find out that you have been talking to the police we are going to kill you, I'm killing mommas, I am killing daddies, I'm killing kids, it don't matter. I'm killing everybody." Hearing this, Daniels "just laid a gun on his lap." Both Gordon and Daniels always carried a gun. Hardy further testified about overhearing Daniels and Gordon say that they shot McClelland the day before because they were convinced he was complicit in a shooting where Daniels was wounded, and because he was reputed to be bad-mouthing Daniels.

Hardy also testified that after she talked with police, she received communications from Daniels's father, and even Hardy's own brothers, one of whom is in San Quentin. These communications induced sufficient fear in Hardy that she was put in the Witness Protection Program, and is currently receiving approximately $400 per month for her living expenses. Hardy testified on cross-examination that she was a regular if not heavy user of drugs, who often got her drugs from Daniels or Gordon. Hardy testified that she talked to police to avoid Daniels and Gordon being killed by police trying to apprehend them.

David Wagner testified that on the afternoon of January 12, 2005, he was walking home from work. He was near the Parkside Market on Davi Avenue in Pittsburg when he noticed a white sedan stopped in the middle of the intersection. The car had three African-American male occupants, one driving and two in the back seat. Wagner further testified that he heard a "bang" and saw a man "falling." The car then "took off" at high speed. Wagner called 911.

The man shot was Irving Griffin, who testified that on January 12 he and his cousin Dupree Straughter were approaching a market on Davi Street when he was shot in the back. Griffin never saw two men jump out of a white car, and he had no memory of being shot. Griffin knew Daniels because "[w]e was incarcerated in Byrons Boys Ranch;" he did not know Gordon. Griffin further testified he did not recall telling Officer Sullivan that he saw a white

3

Buick speeding away from the scene. After he was taken to the hospital, Griffin told police there was no reason for him to attempt to identify who shot him because he did not see his assailants. Officer Sullivan, who spoke with Griffin at the scene of the shooting, and subsequently at the hospital, testified that he believed Griffin was evading answering his questions.

Derrick Blanche testified that he met with Griffin in the hospital after Griffin was shot. Griffin (who at trial did not recall talking to Blanche) was unable to identify who shot him. Blanche denied telling Officer Deplitch that Griffin had identified defendants. Officer Deplitch testified that Blanche told him that Griffin did identify defendants as his assailants.

Griffin's cousin Dupree [Straughter] was a witness to the shooting. He testified that he was walking on the street with Griffin when his cousin saw something and "panicked." They ran and hid behind a building waiting for, in Griffin's words, "somebody to go by." Straughter further testified that he and Griffin had resumed walking when they "heard gunfire" and Griffin was on the ground screaming for help.

Straughter further testified that after the shooting, Officer Blazer of the Pittsburg police "threw me straight in the back of a police car, and I sat there for a long time." Straughter acknowledged that he told an officer that, before the shooting, Griffin had pointed to a number of persons and said "he had problems with" them. The persons then got into a white car, but by then Straughter and Griffin were behind the building. Straughter did not see the white car again. Straughter did not identify the occupants beyond saying that they were from the "El Pueblo" area of Pittsburg. Straughter testified that he was not trying to be uncooperative, but that he was in shock.

Paul Fordyce and Steven Kaiser testified about a shooting incident they observed on January 12, 2005. They were stopped in separate cars at a stop light on Somersville Road in Pittsburg, when they saw Daniels emerge from a white two-door American-made vehicle waiting for the light. Both testified that they observed Daniels walk over to a brown-colored vehicle, produce a gun, and fire five to six shots, disintegrating the rear window. When the brown car drove away, Daniels ran back to the white car, which quickly left the scene.

The white vehicle was possibly Martinez's stolen two-door Buick. Fordyce testified that the white car he saw was an Oldsmobile, while Kaiser remembered it as "either a Buick or an Olds." Fordyce testified that Daniels was wearing a camouflage jacket and a black wool knit cap. Kaiser recalled the cap as a dark-colored "ski cap," and the coat as merely "bulky" and unzipped.

Although both Fordyce and Kaiser made positive identifications of Daniels at trial, this differed from how they behaved immediately after the shooting. Kaiser was willing to look at a photo lineup, and identified Daniels. But Fordyce would not, because he did not want to get involved.

A number of shell casings recovered at the scene were subjected to ballistic analysis and determined to have been fired from the same .40 Smith and Wesson pistol used in the McClelland shooting. From photographs of Gordon holding a Sig/Sauer pistol and a Smith and Wesson revolver, an expert testified that either of these weapons could have fired the .40 cartridges. Hardy gave to police a box of Smith & Wesson .40 calibre ammunition at the scene left at her apartment by defendants. The box had blood on it.

4

Daniels was arrested on January 29, 2005 after the car he was in was stopped for speeding. A black knitted cap was found in the car.

Tiffany Hart testified that she was friendly with Gordon and Daniels. She had seen Daniels and Gordon carrying guns, but not during January 2005.

Hart was interviewed by Officer Deplitch on January 25 and February 15, 2005, and her version at trial was that she did not tell Deplitch that: (1) she saw Daniels, Gordon, or an individual named Alvin Harvey on January 12; (2) Daniels and Gordon were in possession of handguns on that date; or (3) Daniels and Gordon carried guns on a daily basis. With little warning, Hart blurted out that everything she had told Deplitch was untrue.

With the aim of introducing everything Hart had said to Deplitch, the prosecutor then marched through a series of "When you told Detective Deplitch that ..., that was a lie?" questions. Hart admitted that she still wrote letters to Gordon and visited him in jail. Hart further testified that she told Deplitch nothing at the February 15 interview about the Griffin shooting or the events of January 12. Hart concluded her direct examination by testifying that there was no way she would have voluntarily come to court.

On cross-examination, Hart testified that she was told by Deplitch that if she testified "he would help me with a case ... that I have" (possibly a reference to a pending prostitution charge). However, she admitted that it was she who approached Deplitch; he did not come to her. Hart further testified that many of the things she had said to Deplitch were motivated by anger at Gordon, whom she nevertheless loved.

Officer Deplitch then took the stand and authenticated the videotape made of his January 25 interview with Hart. The tape was played for the jury and later admitted in evidence. On the tape, Hart told Deplitch that McClelland had told her that he was shot by Daniels and Gordon. When Hart asked Gordon if this was true, Gordon admitted that it was, that he and Daniels shot McClelland because he was believed responsible for getting Daniels shot in Richmond. As for the shooting of Griffin, Hart told Deplitch that on January 12, she, Daniels, Gordon, and Harvey were riding in a white sedan (variously described by Hart as a Buick or an Oldsmobile), with Daniels wearing a black knit cap. Daniels and Gordon saw two men (presumably Griffin and Straughter) walking on the street, and Daniels and Gordon resolved to shoot Griffin. Apparently, it was the noise of Daniels accidentally dropping his gun on the street that caught Griffin's attention and caused him to run. Daniels and Gordon returned to the vehicle and began driving around, looking for Griffin, with Daniels and Gordon both saying "We gonna get them." When they spotted Griffin, Gordon drove the car at him. Gordon told Daniels "Shoot him." After Daniels shot Griffin in the back, Daniels and Gordon laughed about the shooting as they drove away.

Daniels did not testify or present any evidence.

The sole witness called by Gordon was Pittsburg Police Officer Ligouri who testified that she was one of the officers who investigated the Griffin shooting. Officer Ligouri testified that she spoke to a witness named Amber Wheeler, who told her that three black men in a white Buick were responsible for the shooting. Wheeler heard only a single shot. According to Officer Ligouri, Wheeler recounted that she asked Straughter who shot Griffin, and Straughter replied he did not know.

5

*People v. Daniels*, No. A113184, 2009 WL 568918, at *1-5 (Cal. Ct. App. Mar. 6, 2009).

## STANDARD OF REVIEW

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the grounds that he is in custody in violation of the Constitution or law or treaties of the United States." 28 U.S.C. § 2254(a); *see also Rose v. Hodges*, 423 U.S. 19, 21 (1971). Because the Petition in this case was filed after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), AEDPA's provisions apply. *See Little v. Crawford*, 449 F.3d 1075, 1079 (9th Cir. 2006) (citing *Woodford v. Garceau*, 538 U.S. 202, 207 (2003)).

Under AEDPA, which provides for a deferential standard of review, a federal court may grant the writ with respect to any claim that was adjudicated on the merits in state court only if the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d). It is the habeas petitioner's burden to show he is not precluded from obtaining relief by § 2254(d). *See Woodford v. Visciotti*, 537 U.S. 19, 25 (2002).

"Clearly established federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams (Terry) v. Taylor*, 529 U.S. 362, 412 (2000); *Barker v. Fleming*, 423 F.3d 1085, 1093 (9th Cir. 2005) (holding that "clearly established" federal law determined as of the time of the state court's last reasoned decision). A state court decision is "contrary to" Supreme Court authority, that is, falls under the first clause of § 2254(d)(1) only if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 412-13. A state court decision is an "unreasonable application of" Supreme Court authority, falling

1 under the second clause of § 2254(d)(1), if it correctly identifies the governing legal principles
2 from the Supreme Court's decisions but "unreasonably applies that principle to the facts of the
3 prisoner's case." *Id.* at 413. The federal court on habeas review may not issue the writ "simple
4 because the court concludes in its independent judgment that the relevant state-court decision
5 applied clearly established federal law erroneously or incorrectly." *Id.* at 411. Rather, the
6 application must be "objectively unreasonable" to support granting the writ. *Id.* at 409.

Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003); *see also Torres v. Prunty*, 223 F.3d 1103, 1107 (9th Cir. 2000).

In determining whether the state court's decision is contrary to, or an unreasonable application of, clearly established federal law, a federal court looks to the decision of the highest state court to address the merits of a petitioner's claim in a reasoned decision. *LaJoie v. Thompson*, 217 F.3d 663, 669 n.7 (9th Cir. 2000). If the highest state court has summarily denied a petitioner's claim, the habeas court may "look through" that decision to the last state court addressing the claim in a reasoned decision. *See Shackleford v. Hubbard*, 234 F.3d 1072, 1079 n.2 (9th Cir. 2000) (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991)).

## DISCUSSION

Petitioner seeks relief based on two claims: (1) there was insufficient evidence to support the necessary element of "force or fear" for Petitioner's carjacking and robbery convictions; and (2) Petitioner was denied his rights to a fair trial and the due process of law by the admission of rap lyrics as evidence against him. (Petition at 2.)

### I.     Insufficient Evidence of Force or Fear Claim.

Petitioner contends that his "convictions for [the] carjacking of Martinez's car and the robbery of his cell phone and keys do not rest on sufficient substantial evidence of the element of force or fear." (Petitioner's Memorandum of Points and Authorities ("Pet. Memo") at 1.) He notes, correctly, that under the relevant California Penal Code sections, 215 and 211 respectively, the property taken must have been obtained "by means of force or fear." Cal.

7

Penal Code §§ 215, 211. However, for the reasons below, the Court holds that the California Court of Appeal's rejection of this claim was not objectively unreasonable.

### A. The State Court of Appeal's Determination.

The Court of Appeal was the last state court to address the merits of this claim in a reasoned decision, and as such, the Court looks to that court's analysis of the claim. *See LaJoie*, 217 F.3d at 669 n.7; *Packer*, 291 F.3d at 578-79. Petitioner raised this issue on his direct appeal. He argued then, as he does now, that the finding of "force or fear" that is required under the California Penal Code for robbery and carjacking was not supported by sufficient evidence at trial.

The Court of Appeal discussed the evidence at trial that was provided by the victim, Hilario Martinez, who testified that Daniels and another man approached Mr. Martinez and demanded his cell phone and keys. *Daniels*, 2009 WL 568918, at *6. Mr. Martinez handed over the items and walked away, later reporting the incident to the police. *Id*. Martinez testified that he saw a gun in the possession of one of the men but he did not testify which one had the gun. *Id*.

The Court of Appeal acknowledged that Martinez's testimony was somewhat confused on the issue of where the gun was and how it was displayed, but determined that it was within the jury's sound discretion to weigh Mr. Martinez's testimony as to the entire incident and to make an independent determination of whether the element of force or fear was present. *Id*. at *6-7. The Court of Appeal reasoned that "[a] crime victim's inexactitude in recollecting events laden with potential violence is a matter the law accepts." *Id*. at *6 (*citing People v. Humphrey*, 13 Cal. 4th 1073, 1094 (1996). Furthermore, the Court of Appeal noted:

> On the crucial point that Daniels emphasizes, all Martinez stated with certainty is the Daniels did not 'point a gun' at him. Martinez did not categorically state that it was not Daniels who either had the gun in his hand – but did not point it – or otherwise displayed it to Martinez. But even if it was the other man who had the gun, this fact does not avail Daniels because he was clearly a principal to the crime – and thus no less culpable.

*Id*. at *6.

The Court of Appeal continued by considering Martinez's testimony that appellant had made a "demand" for his property, finding that the jury could have reasonably inferred that the

8

1    combination of the demand with the presence of a weapon was "potent enough to ensure
2    submission." *Id*. at *7. As such, the Court of Appeal held that "[t]he conclusion that the
3    transfer was involuntary and the result of implied coercion was within the jury's power to
4    draw," and that the jury's finding of force or fear was supported by substantial evidence. *Id*.

### B. The Court of Appeal's Conclusion Was Not Objectively Unreasonable.

Petitioner is correct in his assertion that "[t]he Fourteenth Amendment's guarantee of due process of law required that a conviction under state law be supported by substantial evidence as to each element." (Pet. memo at 1 (*citing Jackson v. Virginia*, 443 U.S. 307, 319 (1979).) As such, a criminal defendant may not be convicted unless there is "proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). A state prisoner who alleges that the evidence in support of his state conviction is insufficient to support a finding of guilt beyond a reasonable doubt states a constitutional claim, which, if proven, entitles him to federal habeas relief. *Jackson*, 443 U.S. at 321.

A federal court reviewing collaterally a state court conviction does not determine whether it is satisfied that the evidence established guilt beyond a reasonable doubt. *Payne v. Borg*, 982 F.2d 335, 338 (9th Cir. 1992), cert. denied, 510 U.S. 843 (1993). The federal court "determines only whether, 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *See id*. (quoting *Jackson*, 443 U.S. at 319). Only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt may the writ be granted. *See Jackson*, 443 U.S. at 324; *Payne*, 982 F.2d at 338.

On habeas review, a federal court evaluating the evidence under *Jackson* must consider all of the evidence presented at trial. *LaMere v. Slaughter*, 458 F.3d 878, 882 (9th Cir. 2006). If confronted by a record that supports conflicting inferences, a federal habeas court "must presume – even if it does not affirmatively appear on the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Jackson*, 443 U.S. at 326. After AEDPA, a federal habeas court applies the standards of *Jackson* with an

9

1 additional layer of deference. *Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005).
2 Generally, a federal habeas court must ask whether the operative state court decision reflects an
3 unreasonable application of *Jackson* to the facts of the case. *Id.* at 1275.

4 The Petitioner argues that "[t]he jury's findings here that the taking of the keys, car and
5 cell phone was accompanied by the necessary additional element of 'force or fear' is not
6 supported by the evidence presented." (Pet. memo at 2.) Petitioner acknowledges that Martinez
7 testified at trial that he saw a gun in the possession of either Petitioner or his co-Defendant, but
8 argues that because the victim never stated that the gun was "brandished or pointed" at him, that
9 this means the victim was unafraid. (*See* Petitioner's Reply Memorandum of Points and
10 Authorities ('Pet. Reply") at 2-3.) Petitioner contends that the gun could have been interpreted
11 by the victim as merely a part of Petitioner's outfit. (*Id*.) Petitioner acknowledges Martinez's
12 testimony that Petitioner "demanded" his cell phone and keys, as well as that referring to the
13 presence of a gun. (*Id*.) However, Petitioner contends that this evidence, even taken in
14 combination, is insufficient to show the requisite force or fear element. (*Id*.) The Court finds
15 this argument unpersuasive.

16 "The element of fear for purposes of robbery is satisfied when there is sufficient fear to
17 cause the victim to comply with the unlawful demand for his property." *People v. Ramos*, 106
18 Cal. App. 3d 591, 601-02 (1980). "It is not necessary that there be direct proof of fear; fear may
19 be inferred from the circumstances in which the property is taken." *People v. Morehead*, 191
20 Cal. App. 4th 765, 775 (2011) (*citing People v. Holt*, 15 Cal. 4th 619, 690 (1997)). "If there is
21 evidence from which fear may be inferred, the victim need not explicitly testify that he or she
22 was afraid." *Id*. (*citing People v. Cuevas*, 89 Cal. App. 4th 689, 698 (2001)). "The requisite
23 fear need not be the result of an express threat or the use of a weapon." *Id*. *(citing People v.*
24 *Brew*, 2 Cal. App. 4th 99, 104 (1991)). "Resistance by the victim is not a required element of
25 robbery, and the victim's fear need not be extreme to constitute robbery." *Id*. (*citing People v.*
26 *Davison*, 32 Cal. App. 4th 206, 216 (1995)). "All that is necessary is that the record show
27 'conduct, words, or circumstances reasonably calculated to produce fear....'" *Id*. (*citing Brew*, 2
28 Cal. App. 4th at 104). "An unlawful demand can convey an implied threat of harm for failure to

10

comply, thus supporting an inference of the requisite fear." *Id*. (*citing In re Anthony H.*, 138 Cal. App. 3d 159, 166 (1982)).

For example, in *In re Anthony H.*, the juvenile defendant appealed his conviction for robbery under California Penal Code Section 211. 138 Cal. App. 3d at 161. The court found there was enough evidence of the defendant's use of force or fear to substantiate the conviction. *Id*. The defendant had approached his female victim, who was riding her bicycle, in a car. *Id*. at 162. The defendant exited the car, approached the victim, and told her "I don't want to harm you, but I want your purse." *Id*. The victim claimed she did not have a purse, and the defendant reached into her shopping bag, located in the rear rack of the victim's bicycle, and removed her purse. *Id*. When the defendant then fled the scene in his car, the victim flagged down a passing car and engaged in pursuit of the defendant. *Id*. The pursuit ended when a police officer noticed the chase and joined in, ultimately apprehending the defendant. *Id*.

In the above case, the court found sufficient facts to satisfy the force or fear element of section 211 robbery where the defendant displayed no weapon, spoke politely to the victim, made no move to touch her, made no threats whatsoever, and where the victim actually engaged in a high-speed chase to reclaim her stolen property. Here, in contrast, the Petitioner made an unlawful, abrupt demand for his victim's belongings, with a gun present and visible to the victim. The Court cannot say that no reasonable trier of fact could have found such behavior sufficient to have induced fear in the victim. As such, the Court holds that the Court of Appeal's decision to uphold Petitioner's convictions for carjacking and robbery was not unreasonable.

**II.    Admission of Rap Lyrics Claim.**

Petitioner's second claim for habeas relief focuses on the trial court's admission of rap lyrics found in Petitioner's jail cell during trial. Petitioner claims that the admission of these lyrics violated his right to Due Process because they were admitted "solely to show criminal propensity." (Pet. Memo at 2.)

///

///

11

**A.     The State Court of Appeal's Determination.**

The Court of Appeal was the last state court to address the merits of this claim in a reasoned decision, and as such, the Court looks to that court's analysis of the claim. *See LaJoie*, 217 F.3d at 669, n.7; *Packer*, 291 F.3d at 578-79. Petitioner raised substantially the same argument below that he raises here and the Court of Appeal rejected it. Petitioner argues taht the trial court erred by admitting into evidence the rap lyrics found in Petitioner's jail cell. The lyrics at issue are as follows:

> "These Niggas be working wit the D.A. and investigators. They scared of me because I pack big pistols and I ain't scared to blap a hater. I am tired of the pain. My life always feels like a struggle. I'm on a mission to bubble. I got the ball in my hands and I ain't going to fumble. You Niggas think I'm cool, but don't let this smooth taste fool ya.
> 
> "I'm that Nigga that is quick to pull that Ruger. I ain't talking about six shots, I'm talking about 30. Pop my shit off ..., and it time to get it dirty. Always flirty wit a bitch wit big hips and tits. I jus want to be rich. Eat lobster and wear expensive shit. You Niggas tried to take my life, but didn't succeed. What goes around comes around. Thought it would – it was cool, but got 40 ass hit wit about eight rounds. Screaming like a bitch, trying to plead you case now. Ain't no talking, just killing Niggas. Got me on one now. Caught a Nigga at the store that was running his mouth a few months ago. But now the table's turned, it's him on the other end now. And me behind the gun. He saw me, the Nigga tried to run. Pow one shot was released from my gun. Now he lay in the street begging for his life. Too late, now you should have thought twice. I tell the real life, I tell the real shit, nothing fake in my raps. Never trust a bitch, she'll have you rapped up. Sent off doing life I keep my shit on my hip. Ain't no telling who try and test my .357 Sig ... guaranteed to split a Nigga wig. HK-93 is the problem solva. Only automatics, no revolver. So I say it again, fuck you mama and all you ken. You talk a good game, but I see right through you all. Just let these 40 cal shots go right through ya.
> 
> "I pray to God every day to let me out of these four walls. The whole town mad at me. Haters want to see me fall. They say I'm outta control. Want me sent to the pen and let me out on parole. Who can I trust is that question.
> 
> "Youself is what I can go. Which way can I die. I try not to cry because I have too much pride. They put me in a cage away from the street. They say I'm wild because them suckas I defeat. Stressed out sitting on my bunk thinking to myself I just wanted a few bucks. I ask myself is this a dream. But when I see these four walls I know it's reality. Trust no one because you'll end up a casualty. In this game come up a statistic. Fuck wit me or family and get your wig split. I try not to sin, but it just keeps on happening. Just like my gun keeps on clapping. El Pueblo projects that's where I'm from. All my life raised around coke and guns. Yeah it was fun I can say that, but when it's time to put on all your black you better be ready to bust yo gat.
> 
> "I get caught, you get caught, matter say it's a rap. Win trial, I guarantee we'll be back. Fat sack on my lap right beside my gat. Paint

12

> shining, rim spinning, when I pass through the street middle fingers in the air wit.... Yeah, the same Niggas suckas can't be. So as I say just keep it street."

*Daniels*, 2009 WL 568918, at *8-9.

Considering the lyrics as written, the Court of Appeal affirmed the trial court's determination that the material "qualified as an admission within the meaning of [California] Evidence Code section 1220." *Id*. at *11. The Court of Appeal reasoned that the verses "did not have to be viewed solely as an abstract statement of 'gangsta' culture. The details set forth in the lyrics were sufficiently close to the evidence of the crimes that [they] could be viewed as autobiographical." *Id*. The Court noted that, introduced as admissions, the lyrics were "eminently relevant" and uniquely probative. *Id*.

The Court of Appeal next examined the lyrics' possible prejudicial effect, and was unconvinced by Petitioner's argument that the lyrics would prejudice the jury because they represent "a different 'cultural background.'" The Court of Appeal reasoned that rap music is sufficiently prevalent as a genre of music to be unlikely to prejudice Petitioner. *Id*. The Court of Appeal also disagreed with Petitioner's argument that the trial court had failed to properly consider the material or to weigh its probative value against its prejudicial impact, and instead characterized the trial court's ruling on this issue as "conscientious." The Court of Appeal thus affirmed the trial court's admission of the rap lyrics as evidence against Petitioner. *Id*. at *11-12.

**B.    The Court of Appeal's Conclusion Was Not Objectively Unreasonable.**

Petitioner makes essentially the same argument before this Court as he did before the California Court of Appeal: that the lyrics were improperly admitted by the trial court to show Petitioner's criminal propensity, and as such created undue prejudice against Petitioner. For the following reasons, the Court finds this argument unpersuasive.

Contrary to Petitioner's contention that the lyrics were admitted to show Petitioner's criminal propensity, the lyrics on their face directly evidence Petitioner's involvement in the crimes he was charged with. As the Court of Appeal noted, Petitioner wrote about prosecution witnesses testifying against him at trial and about the circumstances surrounding the attempted

13

1  murder of Irving Griffin. Petitioner himself admits that at least half of the lyrics do in fact
2  "concern ... the charged crimes." (Pet. Reply at 4.) As such, Petitioner's argument that the trial
3  court admitted the rap lyrics to show "other acts" is unconvincing. Rather, the lyrics were
4  properly admitted as admissions.

Petitioner's alternative argument, that these rap lyrics – and rap lyrics in general – are more prejudicial than probative, is similarly unavailing. Courts across the nation have allowed rap lyrics to be used against the defendants who penned them. *See, e.g.*, *U.S. v. Foster*, 939 F.2d 445, 455-57 (7th Cir. 1991); *People v. Olguin*, 31 Cal. App. 4th 1355, 1372-75 (1994); *Cook v. State*, 345 Ark. 264, 269-70 (2001); *Greene v. Com.*, 197 S.W. 3d 76, 87 (Ky. 2006); *Joynes v. State*, 797 A.2d 673, 677 (Del. 2002); *People v. Williams*, 2006 WL 3682750, *1 (Mich. Ct. App. 2006); *State v. Tisius*, 92 S.W.3d 751, 760-61 (Mo. 2002) (defendant did not write the lyrics himself but the facts showed that defendant had used the song to "psych himself up" for his crime);.

In *Olguin*, the appellate court affirmed the admission of the defendant's rap lyrics as evidence against him. There, the lyrics were highly probative, among other reasons, because they evidenced the defendant's gang membership "and, inferentially, his motive and intent on the day of the killing." *Id*. at 1373. Here, similarly, Petitioner's lyrics are highly probative of his guilt for the crimes charged. As the Court of Appeal noted:

> The material did not have to be viewed solely as an abstract statement of "gangsta" culture. The details set forth in the lyrics were sufficiently close to the evidence of the crimes that lyrics could be viewed as autobiographical. That made it an admission, and thus eminently relevant ... And, as an admission from Daniels himself, it obviously had a greater probative value than the other incriminatory sources identified by Daniels in his brief.

*Daniels*, 2009 WL 568918, at *11 (*citing People v. Lewis*, 43 Cal. 4th 415, 497 (2008); *People v. Horning*, 34 Cal. 4th 871, 898, n. 5. (2004)).

Considering the above, the Court of Appeal was not objectively unreasonable in its decision to affirm the admission of the lyrics as a confession. The lyrics were not admitted to show propensity, but were fairly admitted as admissions because they constitute direct evidence of Petitioner's involvement in the crimes charged. For the same reason, this evidence is not

14

more prejudicial than probative. The Court of Appeal engaged in a reasoned and thoughtful analysis and this Court will not disturb its sound judgment on this issue.

**CONCLUSION**

For the foregoing reasons, this Court DENIES Perez's petition for a writ of habeas corpus. Rule 11(a) of the Rules Governing Section 2254 cases now requires a district court to rule on whether a petitioner is entitled to a certificate of appealability in the same order in which the petition is denied. Petitioner has failed to make a substantial showing that his claims amounted to a denial of his constitutional rights or demonstrate that a reasonable jurist would find the denial of his claims debatable or wrong. *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Consequently, a certificate of appealability is not warranted in this case. A separate judgment shall issue, and the Clerk shall close the file.

**IT IS SO ORDERED.**

Dated: January 17, 2013

JEFFREY S. WHITE
UNITED STATES DISTRICT JUDGE